Judge OHLSON
delivered the opinion of the Court.
Contrary to Appellant’s pleas, a military panel with enlisted representation sitting as a general court-martial convicted Appellant of one specification of rape on divers occasions and two specifications of assault consummated by a battery in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928 (2012), The panel acquitted Appellant of one specification of rape and two specifications of assault.
The panel sentenced Appellant to a reduction in grade to E-l, forfeiture of all pay and allowances, and confinement for four years. The military judge ruled that the convening authority could not approve the reduction in grade. Pursuant to that ruling, the convening authority approved only so much of the adjudged sentence as extended to the forfeiture and confinement. The United States Air Force Court of Criminal Appeals affirmed the findings and granted a six day credit[1] against the sentence in Appellant’s case,
We granted review of the following issue: The Chief of Staff of the Air Force advised the convening authority that, unless he retired, the Secretary of the Air Force would fire him. Was the convening authority’s subsequent referral of charges unlawfully influenced by the threat to his position and career?
United States v. Boyce, 76 M.J. 402, 402-03 (C.A.A.F. 2016).
Following our review of the entire record, we conclude that an objective disinterested observer with knowledge of all the facts and circumstances would harbor a significant doubt about the fairness of the court-martial proceedings and therefore conclude that there is the appearance of unlawful command influence in this case. We therefore reverse the findings and the sentence in this case without prejudice and return the case to the Judge Advocate General with a rehearing authorized.
I. Background
The underlying facts leading to the charges and convictions in this sexual assault case are not directly relevant to the issue before us. We therefore proceed only with a recitation of those facts that are pertinent to the unlawful command influence allegation.
During the relevant time period, Lieutenant General (Lt Gen) Craig A. Franklin was the commander of the Third Air Force. On February 26, 2013, Lt Gen Franklin used his clemency authority under Article 60, UCMJ, 10 U.S.C, § 860 (2012), to set aside the findings and sentence in the unrelated case of United States v. Wilkerson. Wilkerson was a lieutenant colonel (Lt Col) in the Air Force and had been convicted at court-martial of aggravated sexual assault. Lt Gen Franklin’s decision to set aside Wilkerson’s conviction was against the advice of his Staff Judge *245 Advocate (SJA), Colonel (Col) Joseph Bialke, who recommended clemency in the form of an adjusted sentence.
In a March 12, 2013, letter to then-Secretary of the Air Force Michael B. Donley, Lt Gen Franklin sought to explain his decision in the Wilkerson case. He wrote:
Obviously it would have been exceedingly less volatile for the Air Force and for me professionally, to have simply approved the finding of guilty. This would have been an act of cowardice on my part and a breach of my integrity. As I have previously stated, after considering all matters in the entire record of trial, I hold a genuine and reasonable doubt that Lt Col Wilkerson committed the crime of sexual assault.
Also on March 12, 2013, General (Gen) Mark A. Welsh III, who recently had been promoted to Chief of Staff of the Air Force, e-mailed Lt Gen Franklin, writing: “It’s going to be a little uncomfortable for awhile, Hang in there.”
Lt Gen Franklin’s clemency action garnered considerable negative attention from Congress and the media.[2] However, despite this backlash, Lt Gen Franklin continued to defend his Wilkerson decision. Indeed, he later tried to intervene on behalf of then-Lt Col Wilkerson in order to have his promotion to colonel approved upon his release from confinement.
In a different case addressing sexual assault, United States v. Oropeza, Lt Gen Franklin explained his thought process prior to dismissing the charges in the Wilkerson case as follows:
Yes, I thought about [my career advancement in the military] just knowing that this was probably going to get Congressional interest and the Senate, who confirms GOs [general officers] for Three and Four Star billets, so whether or not I was going to go to another Three-Star Billet after this job, or maybe get a Four-Star billet, you know, I knew this would probably make this my last job potentially, so yeah, I knew this was going to have probably [sic] future impact on me.
When asked if he had any regrets about his decision because of the subsequent political “fallout,” Lt Gen Franklin replied, “No, I’ll tell you I am sleeping like a baby at nighttime. I made the right decision even amidst all the attacks.”
On September 3, 2013, Lt Gen Franklin declined to refer charges against an airman in the case of United States v. Wright. This was done prior to trial and consistent with the recommendation of his SJA, Col Bialke.. The charges in that case also involved sexual assault allegations. See 75 M.J. 501, 502 (A.F. Ct. Crim, App. 2015) (en banc). Shortly after Lt Gen Franklin dismissed the charges and specifications, then-judge Advocate General of the Ah’ Force, Lt Gen Richard Harding, called Col Bialke regarding the Wright case, Id. at 503. Col Bialke said that Lt Gen Harding told him: “the failure to refer the case to trial would place the Air Force in a difficult position with Congress; absent a ‘smoking gun,’ victims are to be believed and their cases referred to trial; and dismissing the . charges without meeting with the named victim violated an Air Force regulation.” Id.
On December 20, 2013, Deborah Lee James was appointed as Secretary of the Air Force. On December 23,2013, Lt Gen Franklin read what he described as an article in which a senator indicated he would be retiring soon. On December 27, 2013, the Chief of Staff of the Air Force, Gen Welsh, telephoned Lt Gen Franklin and informed him that the new Secretary had “lost confidence” in him and that he had two options: voluntarily retire from the Air Force at the lower grade of major general, or wait for the Secretary to remove him from his command in the immediate future. Three hours after this call, Lt Gen Franklin decided to retire. In his written retirement request, Lt Gen Franklin stated: “My decisions as a General Court Martial [sic] convening authority [ (GCMCA) ] have come under great public scrutiny,” and “media attention ... will likely *246 occur on subsequent sexual assault cases I deal with.”
On the same day that Lt Gen Franklin was contacted by the Chief of Staff, he received the referral package regarding Appellant’s case, which included sexual assault charges. On January 6, 2014, Lt Gen Franklin referred Appellant’s case to a general court-martial. Two days later he publicly announced that he would step down from his position as Third Air Force Commander on January 31, 2014, and would officially retire two months later. ■
On January 28, 2014, Lt Gen Franklin was interviewed by Appellant’s defense counsel. The affidavit documenting this interview reflects that Lt Gen Franklin stated the following: he decided to refer Appellant’s case “independently”; there “probably is an appearance of UCI [unlawful command influence] but I wasn’t affected by it”; and it “would be foolish to say there is no appearance of UCI.”
On February 13, 2014, the Government provided an affidavit to the trial court in response to a defense motion to dismiss all charges against Appellant due to unlawful command influence. In this affidavit, Lt Gen Franklin stated: “Any comments by superior government officials, both civilian and military, had absolutely no impact on my decision-making as a convening authority,” and “I did not and would not allow improper outside influence to impact my independent and impartial decisions as a GCMCA.” However, he also conceded in the affidavit that his decision in the Wilkerson case “has been and continues to be a subject of substantial public controversy,” and noted that the charges which he had declined to refer in the Wright case “had been re-preferred by the Air Force District of Washington.”
In ruling on the defense’s motion, the military judge stated that although the defense had met its initial burden of demonstrating that there was some evidence of unlawful command influence:
[I]t had absolutely no impact on this particular case. There could be an argument, in fact, that General Franklin may be the most bombproof of any convening authority out there simply because of ... his retirement, and the fact that he has, on occasion, seemingly gone against the interests of others in the military.
In his later written ruling, the military judge stated that, the “Court is convinced beyond a reasonable doubt that there was no UCI or apparent UCI in [either] the accusa-torial or adjudicative phases of this proceeding.” On appeal, the Air Force Court of Criminal Appeals concurred with the military judge’s analysis.
II. Applicable Law
It has long been a canon of this Court’s jurisprudence that “[unlawful] [c]om-mand influence is the mortal enemy of military justice.”[3] United States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986). “Indeed,” as Chief Judge Everett noted in Thomas, “a prime motivation for establishing a civilian Court of Military Appeals was to erect a further bulwark against impermissible command influence.” Id, And importantly, our Court’s fulfillment of that responsibility “is fundamental to fostering public confidence in the ... fairness of our system of justice.” United States v. Harvey, 64 M.J. 13, 17 (C.A.A.F. 2006).
*247 Two types of unlawful command influence can arise in the military justice system: actual unlawful command influence and the appearance of unlawful command influence. From the outset, actual unlawful command influence has commonly been recognized as occurring when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case. See United States v. Allen, 33 M.J. 209, 212 (C.M.A. 1991); see also United States v. Allen, 31 M.J. 572, 584 (N.M.C.M.R. 1990) (“Unlawful command influence ... is impermissible command control”). As reflected below, however, it took decades for this Court’s jurisprudence to define the contours of what constitutes a meritorious claim of an appearance of unlawful command influence.
Initially our Court did not differentiate between actual unlawful command influence and the appearance of unlawful command influence. Over the years, however, we have explored the distinctions between the two.
The first known acknowledgment of the impropriety of an appearance of unlawful command influence arose in 1954. In a concurring opinion in United States v. Knudson, 4 U.S.C.M.A. 587, 598, 16 C.M.R. 161, 172 (1954) (Brosman, J., concurring in the result), Judge Brosman wrote:
[T]he unfortunate circumstance that the convening authority had previously and openly damned one of these functionaries as an abuser of discretion gives the conduct of the trial an especially unpleasant aroma. Viewing the record as a whole, I am fortified in my belief that the appearance of “command influence” is vivid enough here to require reversal.
(Emphasis added.)
The first time that a majority of the Court of Military Appeals cited an appearance of unlawful command influence as a basis for reversing the conviction of a servicemember occurred ten years later. In United States v. Johnson, 14 U.S.C.M.A. 548, 551, 34 C.M.R. 328, 331 (1964), the Court stated:
In approaching a problem of this nature, the apparent existence of “command control,” through the medium of pretrial communication with court members, is as much to be condemned as its actual existence. As a matter of principle, any doubt in the matter must be resolved in favor of the accused.
(Emphasis added.)
The Court further stated, “The appearance, or the existence, of command influence provides a presumption of prejudice.” Id. (emphasis added).
It took another three decades for the standard that we now use in determining whether there was an appearance of unlawful command influence to emerge. Once again, it was a separate opinion that led the way. Judge Wiss stated:
One judge even went so far as to suggest [that] “[t]he practice of ranking appellate judges should be discontinued. In the absence of specific objective criteria, an objective, disinterested observer fully informed of the facts would entertain a significant doubt that justice was being done” and would perceive an appearance of command influence.
United States v. Mitchell, 39 M.J. 131, 151 (C.M.A. 1994) (Wiss, J., concurring in part, dissenting in part, and concurring in the result) (alteration in original) (quoting United States v. Mitchell, 37 M.J. 903, 930 (N.M.C.M.R. 1993) (Reed, J., concurring in the result)).[4] This language was adopted in a majority opinion four years later. See United States v. Calhoun, 49 M.J. 485, 488 (C.A.A.F. 1998) (“[We] decline to enshrine a right to private civilian counsel paid for by the Government unless an objective, disinterested observer, with knowledge of all the facts, could reasonably conclude that there was at least an appearance of unlawful command influence over all military and other government defense counsel,” (emphasis added)).
A further refinement of this Court’s jurisprudence regarding the appearance of unlawful command influence occurred a few years later. Quoting United States v. Rosser, 6 *248 M.J. 267, 271 (C.M.A. 1979), and citing “ ‘the spirit of the Code,’ ” this Court in United States v. Stoneman favorably cited our previous observation that “‘[t]he appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.’ ” 67 M.J. 36, 42 (C.A.A.F. 2002). And importantly, in Stoneman we more explicitly explained the distinction between actual unlawful command influence and the appearance of unlawful command influence:
The question whether there is an appearance of unlawful command influence is similar in one respect to the question whether there is implied bias, because both are judged objectively, through the eyes of the community_ Even if there was no actual unlawful command influence, there may he a question whether the influence of command placed an “intolerable strain on public perception of the. military justice system.” See United States v. Wiesen, 66 M.J. 172,176 (2001).
Id. at 42-43 (emphasis added) (citations omitted).
Chief Judge Erdmann wove together the various strands of our jurisprudence on this topic a decade ago in United States v. Lewis, 63 M.J. 406, 413 (C.A.A.F. 2006). In doing so, he first stated that in order for a claim of actual unlawful command influence to prevail, an accused must meet the burden of demonstrating: (a) facts, which if true, constitute unlawful command influence; (b) the court-martial proceedings were unfair to the accused (i.e., the accused was prejudiced); and (c) the unlawful command influence was the cause of that unfairness. Id.
Next, in regard to an appearance of unlawful command influence, Chief Judge Erd-mann wrote:
Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with “eliminating even the appearance of unlawful command influence at courts-martial.” United States v. Rosser, 6 M.J. 267, 271 (C.M.A. 1979).... [T]he “ ‘appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.’ ” [United States v.] Simpson, 68 M.J. at [368] 374 [ (2008) ] (quoting Stoneman, 67 M.J. at 42-43). Thus, “disposition of an issue of unlawful command influence falls short if it fails to take into consideration .., the appearance of unlawful command influence at courts-martial.” Id.
Whether the conduct of the Government in this case created an appearance of unlawful command influence is determined objectively. Stoneman, 57 M.J. at 42. “Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an ‘intolerable strain on public perception of the military justice system.’ ” Id. at 42-43 (quoting United States v. Wiesen, 66 M.J. 172, 175 (C.A.A.F. 2001)), The objective test for the appearance of unlawful command influence is similar to the tests we apply in reviewing questions of implied bias on the part of court members or in reviewing challenges to military judges for an appearance of conflict of interest. We focus upon the perception of fairness in the • military justice system as viewed through the eyes of a reasonable member of the public. Thus, the appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.
Id. at 416 (alteration in original) (citations omitted).
As can be seen from the above, unlike actual unlawful command influence where prejudice to the accused is required, no such showing is required for a meritorious claim of an appearance of unlawful command influence,[5] Rather, the prejudice involved in *249 the latter instance is the damage to the public’s perception of the fairness of the military justice system as a whole and not the prejudice to the individual accused.[6] Consequently, consistent with Chief Judge Erd-mann’s opinion in Lewis, it is sufficient for an accused to demonstrate the following factors in support of a claim of an appearance of unlawful command influence: (a) facts, which if true, constitute unlawful command influence; and (b) this unlawful command influence placed an “intolerable strain” on the public’s perception of the military justice system because “an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding,” Id. (internal quotation marks omitted) (citation omitted).
In light of these two factors, the following process ensues when an appellant asserts there was an appearance of unlawful command influence.[7] The appellant initially must show “some evidence” that unlawful command influence occurred. Stonemm, 57 M.J. at 41 (internal quotation marks omitted) (citation omitted); see also United States v. Ayala, 43 M.J. 296, 300 (C.A.A.F. 1995) (“The quantum of evidence necessary to raise unlawful command influence is the same as that required to submit a factual issue to the trier of fact [i.e., “some evidence”].”). This burden on the defense is low, but the evidence presented must consist of more than “mere allegation or speculation.” United States v. Salyer, 72 M.J. 415, 423 (C.A.A.F. 2013); see also Allen, 33 M.J. at 212 (“Proof of [command influence] in the air, so to speak, will not do.” (internal quotation marks omitted) (citation omitted)).
Once an appellant presents “some evidence” of unlawful command influence, the burden then shifts to the government to rebut the allegation. Specifically, the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence. Salyer, 72 M.J. at 423; see also Biagase, 50 M.J. at 151 (“[Regarding the quantum of proof required: once an issue of unlawful command influence is raised, the Government must persuade the military judge and the appellate courts beyond a reasonable doubt that there was no unlawful command influence or that the unlawful command influence did not affect the findings and sentence.”).[8] If the government meets its burden, the appellant’s claim of unlawful command influence will be deemed to be without merit and no further analysis will be conducted. See Salyer, 72 M.J. at 423; Biagase, 50 M.J. at 151.
If the government does not meet its burden of rebutting the allegation at this initial stage, then the government may next seek to prove beyond a reasonable doubt that the unlawful command influence did not place “‘an intolerable strain’” upon the public’s perception of the military justice system and that “‘an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.’ ” *250 Salyer, 72 M.J. at 423 (quoting Lewis, 63 M.J. at 415). If the government meets its evidentiary burden at this stage of the analysis, then the appellant merits no relief on the grounds that there was an appearance of unlawful command influence. See, e.g., United States v. Villareal, 52 M.J. 27, 30-31 (C.A.A.F. 1999) (this Court affirming the decision of the court below after finding that any appearance of unlawful command influence was cured by the military judge’s actions at court-martial). If the government does not meet its evidentiary burden, however, this Court will fashion an appropriate remedy. Lewis, 63 M.J. at 416.
It is these precedents, principles, and procedures—which have been articulated by this Court over the course of more than six decades—which serve as our touchstone as we analyze Appellant’s claims of unlawful command influence in the instant case.
III. Analysis
Appellant is challenging his convictions on the basis of both actual unlawful command influence and the appearance of unlawful command influence. We first turn our attention to the issue of whether there was actual unlawful command influence in this case. We hold there was not. Specifically, we conclude that even assuming an unrebut-ted showing of unlawful command influence by the Secretary of the Air Force and/or the Chief of Staff of the Air Force, there is an insufficient basis to deduce that Appellant personally suffered any prejudice.
In reaching this conclusion, we note the following: a convening authority merely applies a reasonable grounds standard in determining whether to refer charges to a general court-martial (which is quite a low standard), Rule for Courts-Mai-tial 601(d)(1); there were two witnesses—not just one—who alleged abuse by Appellant; there was physical evidence corroborating the allegations against Appellant; there was evidence that Appellant had previously engaged in similar violence; the Article 32, UCMJ, 10 U.S.C. § 832 (2012), Investigating Officer (IO) recommended referral of all sexual assault charges; and every subordinate commander and the SJA recommended referral of all charges against Appellant. Thus, there is no reasonable likelihood that a different convening authority standing in the shoes of Lt Gen Franklin would have made a different referral decision. Accordingly, Appellant is entitled to no relief based on a claim of actual unlawful command influence.
We reach a different result, however, in regard to Appellant’s claim of an appearance of unlawful command influence. In reaching this conclusion we first address the military judge’s determination that Lt Gen Franklin was “bombproof’ in regard to exercising his discretion as the general court-martial convening authority (GCMCA) in this case. As the Government’s appellate brief memorably characterizes it, the military judge’s reasoning was as follows:
[O]f all the general court-martial convening authorities that the Appellant could have ended up with, he was fortunate enough to have drawn a convening authority who had a long history of ignoring political pressure, and, by the time he reviewed the Appellant’s case, no longer had anything to gain or lose when it came to his Air Force career.
We conclude that the military judge’s determination that Lt Gen Franklin was “bombproof’ is not supported by the facts and circumstances surrounding this case. (Although it is a close question, we view the military judge’s determination that Lt Gen Franklin was “bombproof’ as being a legal conclusion rather than a factual finding (i.e., based on the facts in this case, the military judge reached the legal conclusion that Lt Gen Franklin was immune to unlawful command influence).) Specifically, we note that the personnel actions previously taken by the Secretary of the Air Force and/or the Chief of Staff of the Air Force did not inoculate Lt Gen Franklin from further negative personnel actions. For example, if the Secretary came to believe that Lt Gen Franklin was obstinately “refusing” to refer “another” meritorious case to a general court-martial, she could have removed him immediately from his position of command—which likely would have carried significant consequences in terms of adverse public attention and post- *251 military career opportunities. Thus, ah objective disinterested observer would not agree that Lt Gen Franklin had nothing to gain or lose here. Moreover, we note that in light of the attendant circumstances in this case, if anything, Lt Gen Franklin would have been more acutely aware than other GCMCAs about how closely his referral decisions were being scrutinized by his superiors and about the potential personal consequences of “ignoring political pressure” when making those referral decisions. Thus, we conclude that, at a minimum, Lt Gen Franklin was no more “bombproof’ than any other GCMCA.
We next address the military judge’s heavy reliance on Lt Gen Franklin’s assurance that his decision to refer the instant case to a general court-martial was not affected by the previous personnel action taken against him. Specifically, Lt Gen Franklin stated that he “did not and would not allow improper outside influences to impact [his] independent and impartial decisions as a GCMCA.” But that statement by Lt Gen Franklin did not stand in isolation; in his January 28, 2014, interview with defense counsel for this ease, he admirably conceded that there “probably is an appearance of UCI,” and it “would be foolish to say there is no appearance of UCI.”
As we can see from these statements, Lt Gen Franklin himself acknowledged the existence of many of the essential facets of a valid claim of an appearance of unlawful command influence. We therefore conclude that the military judge’s heavy reliance on Lt Gen Franklin’s assurances in this case was misplaced.
Next, we address the Government’s argument that there can be no finding of unlawful command influence here because “no one in a position of authority over Lt Gen Franklin ... even knew of the existence of [this] specific ease.” This argument is unavailing. It is irrelevant whether the Secretary of the Air Force or the Chief of Staff of the Air Force sought to affect Lt Gen Franklin’s independent discretionary decision-making as a GCMCA in this particular case. No showing of knowledge or intent on the part of government actors is required in order for an appellant to successfully demonstrate that an appearance of unlawful command influence arose in a specific case. See Biagase, 50 M.J. at 151. In cases involving unlawful command influence, the key to our analysis is effect— not knowledge or intent.
Having disposed of these preliminary matters, we now turn our attention to the two principal issues at hand. First, did the Secretary of the Air Force and/or the Chief of Staff of the Air Force engage in conduct that constituted unlawful command influence? See Salyer, 72 M.J. at 423. And second, if there was unlawful command influence, would an objective, disinterested observer, fully informed of all the facts and circumstances, harbor a significant doubt about the fairness of the proceeding? See id. We conclude that the answer to both questions is “Yes.”
In concluding that Appellant has met his burden of showing “some evidence” that the conduct of the Secretary of the Air Force and/or the Chief of Staff of the Air Force constituted unlawful command influence, we note the following points. See Stone-man, 57 M.J. at 41.
• Prior to the confirmation of Deborah Lee James as Secretary of the Air Force, a key member of the Senate Armed Services Committee who would later vote on her nomination commented on Lt Gen Franklin’s decision to set aside the findings and sentence in the Wilkerson ease. The senator specifically stated that commanders needed to be held “accountable” for their handling of sexual assault charges.
• Ms. James subsequently was confirmed by the Senate, and on December 20, 2013, she was sworn in as Secretary of the Air Force.
• On December 23, 2013, Lt Gen Franklin read what he described as an article in which one of the senators on the Senate Armed Services Committee indicated that he was scheduled to retire in the near future.
• On December 27, 2013, the Chief of Staff of the Air’ Force telephoned Lt Gen Franklin and informed him that the new *252 Secretary had “lost, confidence” in him and that he had two options: voluntarily retire from the Air Force at the lower grade of major general, or wait for the Secretary to remove him from his command in the immediate future.
• Three hours after this call, Lt Gen Franklin decided to retire. Because Lt Gen Franklin did not have the requisite time in Ms Mghest pay grade, tMs retirement carried with it a loss of rank and a concomitant loss of retirement pay.
• In Ms written retirement request, Lt Gen Franklin acknowledged the following: “My decisions as a [GCMCA] have come under great public scrutiny,” and “media attention ... will likely occur on subsequent sexual assault cases I deal with.”
• On the same day that Lt Gen Franklin was contacted by the CMef of Staff, he received the referral package regarding Appellant’s ease. On January 6, 2014, Lt Gen Franklm referred Appellant’s case, which included sexual assault charges, to a general court-martial. Thus, Appellant’s case qualified as a “subsequent sexual assault case[ ]” that Lt Gen Franklin had expressed concern about due to the likelihood of “media attention” and “great public scrutiny.”
• At the time he made the referral in Appellant’s case, Lt Gen Franklin was vulnerable to additional adverse personnel action by the Secretary of the Air Force. (Lt Gen Franklin did not officially retire until April 1, 2014.)
• The Secretary of the Air Force and the CMef of Staff of the Air Force failed to take the necessary prophylactic steps to ensure that Lt Gen Franklin’s handling of “subsequent sexual assault cases” did not give rise to the appearance of uMawful command influence. Specifically, upon determming that they had lost confidence in him, Lt Gen Franklin’s superiors failed to direct him not to take any further action in regard to court-martial matters pending before him. (For example, they did not direct Mm to send these matters to a Mgher headquarters GCMCA; they did not direct him to send them to an adjacent headquarters GCMCA; and they did not direct Mm to delay action on these matters and hold them until either an acting commander or successor in command had taken over.)
• In the alternative, once Lt Gen Franklin actually did refer the instant ease to a general court-martial, Ms superiors failed to withdraw the charges and to then seek re-referral tM-ough commanders untainted by unlawful command influence.
Under the totality of these circumstances, we conclude that Appellant has shown “some evidence” of unlawful command influence by the Secretary of the Air Force and/or the Chief of Staff of the Air Force regarding the referral of the instant case to a general court-martial. See Stonemcm, 67 M.J. at 41. In making tMs determination, we conclude that the Government has not met its burden of proving beyond a reasonable doubt that the relevant facts cited above did not exist or that these facts did not constitute unlawful command influence. See Salyer, 72 M.J. at 423.
Having established that there was apparent unlawful command influence in tMs case, we next conclude that the Goverament has not met its burden of provmg beyond a reasonable doubt that the conduct of the Secretary of the Air Force and/or the CMef of Staff of the Air Force did not place an intolerable strain upon the public’s perception of the military justice system. See id. To the contrary, we deem the totality of the circumstances in this case to be particularly troubling and egregious. As such, we conclude that an objective, disinterested observer with knowledge of all the facts would harbor a significant doubt about the fairness of the court-martial proceedings. See Lewis, 63 M.J. at 415. Specifically, we conclude that members of the public would understandably question whether the conduct of the Secretary of the Air Force and/or the CMef of Staff of the Air Force improperly inMbited Lt Gen Franklm from exercising Ms court-martial convening authority in a truly independent and impartial manner as is required *253 to ensure the integrity of the referral process. Indeed, we adopt Lt Gen Franklin’s words as our own: “[It] would be foolish to say there is no appearance of UCI.”
In reaching our holding in this case, we fully acknowledge that we do not have the authority to redress the chilling effect that the conduct of the Secretary of the Air Force and/or the Chief of Staff of the Air Force generally may have had on other convening-authorities and in other criminal cases that are not before us. We recognize that such systemic problems must be left to Congress and the executive to address. Nonetheless, in individual cases that are properly presented to this Court—such as Appellant’s—we will remain ever mindful of Chief Judge Everett’s admonition that unlawful command influence is the “mortal enemy of military justice,” and we will meet our responsibility to serve as a “bulwark” against it by taking all appropriate steps within our power to counteract its malignant effects.[9] Thomas, 22 M.J. at 393.
IV. Conclusion
This Court unequivocally endorses the Supreme Court’s observation that “[fjed-eral courts have an independent interest in ensuring that ... legal proceedings appear fair to all who observe them.” Wheat v. United States, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In adhering to this pronouncement, we conclude that the appearance of unlawful command influence in this case cannot go unaddressed. Accordingly, we reverse the findings and sentence in this case without prejudice[10] and return the case to the Judge Advocate General of the Air Force. A rehearing is authorized.

. One day of credit was for the reprimand Appellant received as nonjudicial punishment for a crime that he was later convicted of committing ‘ at his court-martial. The other five days of credit were for excessive post-trial delay without the showing of actual prejudice,

. A member of the Senate Armed Services Committee commented on Lt Gen Franklin’s decision to set aside the findings and sentence against Wilkerson, saying that commanders need to be held "accountable" for overturning sexual assault convictions.

. The principal statutory provision prohibiting unlaw&l command influence is Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2012), which states in pertinent part: "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial ... or any member thereof.” The Secretary of the Air Force is not a person subject to the UCMJ, and it could be argued that it was her conduct—rather than the conduct of the Chief of Staff of the Air Force—that raised the issue of unlawful command influence in this case. Nevertheless, we need not address the factual issue of who was the key actor in this case on the legal issue of whether improper influence by a civilian official not subject to the UCMJ may present a due process error of constitutional dimension, because the Government unequivocally conceded at oral argument that our jurisprudence pertaining to unlawful command influence applies in the instant case, and we deem it appropriate to accept that concession in the course of analyzing the assigned issue.

. The Navy-Marine Corps Court of'Military Review acknowledged that some of this language was adapted from the case of United States v. Berman, 28 M.J. 615, 616 (A.F.C.M.R. 1989).

. A determination that an appellant was not personally prejudiced, by the unlawful command influence, or that the prejudice caused by the unlawful command influence was later cured, is a significant factor that must be given considerable weight when deciding whether the unlawful command influence placed an "intolerable strain" on the public’s perception of the military justice system, However, such a determination ultimately is not dispositive of the underlying *249 issue of whether the public taint of an appearance of unlawful command influence still remains.

. We discern no tension between this standard and our holding in United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999), that "the alleged unlawful command influence [must have] a logical connection to the court-martial,'' A conclusion that there was a "logical connection" to a court-martial is not the same thing as a conclusion that there was prejudice to the individual accused. Rather, "logical connection” is merely a germaneness requirement.

. We review allegations of unlawful command influence de novo. Harvey, 64 M.J. at 19,

.Consistent with this Court's holding in Biagase, we deem it appropriate to apply a "harmless beyond a reasonable doubt” standard for both actual and apparent unlawful command influence because in the military justice system both the right to a trial that is fair, and the right to a trial that is objectively seen to bo fair, have constitutional dimensions sounding in due process. See Thomas, 22 M.J. at 393-94 (C.M.A. 1986); see also Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952) ("Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings ... in order to ascertain whether they offend [canons of fairness]....").

. We pointedly emphasize that this mission is not ours alone. Military judges must continue to fulfill their essential role as the ''sentinel” of the military justice system in indentifying and addressing instances of unlawful command influence. Harvey, 64 M.J. at 14; see also United States v. Douglas, 68 M.J. 349, 355 (C.A.A.F. 2010). Moreover, judges on the service Courts of Criminal Appeals must also appropriately address unlawful command influence whenever they encounter it in specific cases.

. While Appellant has the right to a court-martial process that is free from the taint of unlawful command influence, we conclude that reversing the findings with prejudice would result in an improper windfall for Appellant because he did not suffer individualized prejudice in this case. Cf. United States v. Villamil-Perez, 32 M.J. 341, 344 (C.M.A. 1991) (concluding that appellant suffered no substantial prejudice, so setting aside his dishonorable discharge or reducing its degree "would be an unjustified windfall for appellant”).